IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 23-cv-00047-RM-KAS

GABRIELLA DOCKERY, individually and as the personal representative of the Estate of Christopher Dockery, and
ESTATE OF CHRISTOPHER DOCKERY,

        Plaintiffs,

v.

CITY OF GREELEY, a municipality corporation,
BOARD OF COUNTY COMMISSIONERS FOR WELD COUNTY, a political subdivision, in their individual and official capacity,
JONATHAN BLAIR, individually and as Officer of the Greeley Police Department, in his official capacity,
BRIAN BUDD, individually and as Officer of the Greeley Police Department, in his official capacity,
BRETT RADIN, individually and as Officer of the Greeley Police Department, in his official capacity,
DANIEL CZATPNSKI,[1] individually and as Officer of the Greeley Police Department, in his official capacity,
DAVID WILES, individually and as Officer of the Greeley Police Department, in his official capacity,
KEN AMICK, individually and as Officer of the Greeley Police Department, in his official capacity, and
UNKNOWN SUPERVISORS 1-2, individually and as Officers of the Greeley Police Department, in his official capacity,

        Defendants.

_____

**RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE**
_____

**ENTERED BY MAGISTRATE JUDGE KATHRYN A. STARNELLA**

        This matter is before the Court on **Defendants City of Greeley, Jonathan Blair,**

**Brian Budd, Bret Radin, Daniel Czapinski, and David Wiles' Motion to Dismiss**

---

[1] This Defendant's name appears to be misspelled on both the docket and in Plaintiffs' operative complaint [#89], as his counsel's briefing refers to him as "Daniel Czapinski". *See Greeley Motion to Dismiss* [#93] at 1. Throughout this Recommendation, the Court uses the spelling this Defendant provided through counsel.

Fourth Amended Complaint [Doc. 89] Pursuant to Fed. R. Civ. P. 12(b)(6) [#93] (the "Greeley Motion to Dismiss"); the **Defendant Board of County Commissioners of Weld County's Motion to Dismiss Fourth Amended Complaint [ECF 89]** [#96] (the "BOCC Motion to Dismiss"); and **Defendant Ken Amick's Motion to Dismiss** [#100] (the "Amick Motion to Dismiss"). Plaintiffs filed a combined Response [#104] in opposition to the Greeley and BOCC Motions to Dismiss, as well as a Response [#109] to the Amick Motion to Dismiss. The Defendants filed Reply briefs [#107, #111, #113] in support of their respective motions to dismiss.

The Court has reviewed the briefs, the entire case file, and the applicable law. For the reasons set forth below, the undersigned **RECOMMENDS** that the Amick Motion to Dismiss [#100] and the BOCC Motion to Dismiss [#96] both be **GRANTED** and that the Greeley Motion to Dismiss [#93] be **GRANTED IN PART** and **DENIED IN PART**.

## I. Background

### A.    Factual Allegations

This matter arises from the January 19, 2021 killing of Christopher Dockery by officers of the Greeley Police Department. *Fourth Am. Compl.* [#89], ¶ 2.[2] Plaintiffs allege that "at approximately 2:03 p.m. on January 19, 2021, Mr. Dockery was located near a car wash and a local Loaf-N-Jug. Law enforcement was dispatched to the location at: 3200 23rd, Evans, CO. 80462." *Id.*, ¶ 25. At that time, "Mr. Dockery had an active warrant

---

[2] Plaintiffs have filed several amended complaints. *See Am. Compl.* [#5]; *Am. Compl.* [#9]; *Am. Compl.* [#12]; *Second Am. Compl.* [#19]; *Third Am. Compl.* [#53]; *Fourth (Third) Am. Compl.* [#89]. The operative complaint is captioned as the "Third Amended Complaint and Jury Demand" but all Defendants refer to it as the "Fourth Amended Complaint" or "FAC". *See, e.g.*, *Greeley Motion to Dismiss* [#93] at 1; *BOCC Motion to Dismiss* [#96] at 1; *Amick Motion to Dismiss* [#100] at 1 n.1 ("respond[ing] to what should be the Fourth Amended Complaint"). For consistency, the Court refers to the operative pleading as the Fourth Amended Complaint [#89].

for an alleged kidnapping" but "he was parked in a car by a car wash" and "[n]o commands were given to Mr. Dockery to stop or that he get on the ground; instead, the Defendants fired at Mr. Dockery with deadly force, depriving him of an opportunity to surrender." *Id.*, ¶ 65.

The remainder of Plaintiffs' Fourth Amended Complaint [#89] is no model of clarity. Defendants Blair, Budd, Radin, Czapinski, Wiles, and Amick are Greeley police officers, each allegedly a "principal actor in the murder of Christopher Dockery, and recklessly fired at Mr. Dockery without provocation to kill him." *Id.*, ¶¶ 14-19. The Defendants (identified only collectively) allegedly "began to fire an inordinate amount of ammunition directed at Mr. Dockery while he was seated in his vehicle," which caused him to exit his car in an attempt to get help. *Id.*, ¶ 25. What happened next is unclear. Perhaps this initial volley "was followed by the execution of Mr. Dockery by [Defendants] Radin and Budd"; or perhaps it was "[Defendants] Budd and [Czapinski] [who] approached Mr. Dockery with the intent and understanding to shoot and kill him" and only "[Defendant] Budd [who] shot Mr. Dockery repeatedly, killing him[.]" *Id.*, ¶¶ 25, 81. Separately, Plaintiffs allege that "the responding six officers jointly and recklessly fired 57 deadly rounds into the face, skull, and body of Mr. Dockery" though the Complaint is unclear as to whether this concerns the initial volley or the shots that killed Mr. Dockery. *Id.*, ¶ 67.

Plaintiffs also allege that Defendants "intentionally failed to treat Mr. Dockery for obvious mental health issues and instead used deadly force to cure any mental health defects[.]" *Id.*, ¶ 44. "[D]efendants Radin, Budd, Blair, [Czapinski], Amick, Wiles, and others [allegedly] recognized Mr. Dockery's recent mental health issues and extreme fear cause[d] by their expression of a kill order but failed to procure the necessary and required

mental health treatment and professionals to assist with the de-escalation of this volatile situation." *Id.*, ¶¶ 27, 44. Plaintiffs do not say what mental health issues, if any, Mr. Dockery was manifesting when he was shot.

Plaintiffs allege that the Greeley Police Department and sheriff's office have a policy and practice of deliberate indifference to mental health and that officers are inadequately trained to assist and handle citizens who act erratically or present mental health issues. *Id.*, ¶ 27. They allege that this inadequate training regarding "assessment and handling of citizens with mental health defects was the driving force" behind Mr. Dockery's killing. *Id.* Plaintiffs assert that the practice or custom of inadequate training "was obvious to the official policy makers including chief of police Mark Jones and others," who are not named Defendants in this action. *Id.*

 More broadly, Plaintiffs assert that there is a "cowboy culture" that exists in the Greeley Police Department and the Weld County Sheriff's Department which encourages reckless use of force. *Id.*, ¶ 29. They allege a long list of "policies and practices" they suspect the Greeley Police Department has adopted. *Id.*, ¶¶ 34, 37-39. These alleged policies include, "[u]sing deadly force against a citizen in absence of an imminent threat"; "[f]ailure to deescalate and provide proper mental health assistance before using deadly force against citizens with obvious mental health issues"; and "[i]ndiscriminate and inappropriate use of a firearm and ammunitions." *Id*., ¶¶ 34(b)-(d).

After the killing, "the Defendants," again identified only collectively, allegedly made a "confession to Mr. Dockery's wife and family that the decision was already made to kill Mr. Dockery, and that they were acting on a shoot to kill order regardless of the

circumstances, which would leave no opportunity for surrender" and which "caused Mr. Dockery to flee in fear of being murdered by GPD." *Id.*, ¶ 79.

Plaintiffs raise five claims for relief against all Defendants, all purportedly federal claims brought under 42 U.S.C. § 1983: (1) "Wrongful Death – 4th and 14th Amendment Violation"; (2) "Unreasonable and Excessive Force – 4th and 14th Amendment Violation"; (3) "Conspiracy – 4th and 14th Amendment Violation"; (4) "Fraudulent Concealment of Murder – 1st and 14th Amendment Violation"; and (5) "Loss of Consortium and Denial of Marital Relationship – 14th Amendment Violation." *Id.*, ¶¶ 47-105.[3]

Thus, in addition to the allegations surrounding Mr. Dockery's killing, Plaintiffs accuse Defendants of concealing the identities of the officers involved to deprive Plaintiffs of an opportunity to bring their claim in court. *Id.*, ¶¶ 14-19 (alleging that each officer's identity was "intentionally being withheld by the Greeley Police Department to prevent the Plaintiffs from properly naming this defendant within the statute of limitations"); ¶ 95. They also allege that Defendants interfered with Plaintiff Gabriella Dockery's marital relationship with her husband, Mr. Dockery, in violation of her rights. *Id.*, ¶¶ 102-105.

## B.    The Motions to Dismiss [#93, 96, 100]

Defendants seek to dismiss all claims. The Greeley Defendants argue that (1) claims against the individual officers are time-barred[4]; (2) official capacity claims against the officers should be dismissed as redundant of the claims against the City; (3) all claims

---

[3] The Fourth Amended Complaint [#89] duplicates "Claim Two for Relief" for both excessive force and conspiracy. *See Fourth Am. Compl.* [#89] at 23, 27. Thus, the Court refers to the claims by the order in which they appear, rather than by Plaintiffs' numbering.

[4] The Greeley Defendants have withdrawn their statute of limitations argument. *See Reply* [#107] at 3. The Court therefore does not consider it.

against them are insufficiently pleaded and subject to Rule 12(b)(6) dismissal; (4) the individual officers are entitled to qualified immunity; (5) Plaintiffs have failed to state a theory of municipal liability; (6) the loss of consortium claim is barred by the Colorado Governmental Immunity Act ("CGIA"), C.R.S. § 24-10-101 *et seq.*; and (7) Plaintiffs' excessive force claim is properly brought under the Fourth Amendment, not the Fourteenth Amendment. *See Greeley Motion to Dismiss* [#93] at 7-19.

The BOCC argues that (1) Plaintiffs failed to comply with the CGIA, barring their state tort claims, including claim one (wrongful death); (2) Plaintiffs have failed to state a claim for municipal liability; (3) BOCC is an improper party because it has no authority to control officers of the Weld County Sheriff's Office or the City of Greeley; (4) Plaintiffs fail to assert a municipal liability claim against BOCC; (5) Plaintiffs fail to adequately allege supervisory liability against BOCC; (6) any individual capacity claims against the BOCC Commissioners are barred by qualified immunity; and (7) Plaintiffs have failed to plausibly allege claim two (excessive force), claim three (conspiracy), claim four (fraudulent concealment of murder), or claim five (loss of consortium/interference with protected familial relations). *BOCC Motion to Dismiss* [#96] at 5-18.

Finally, Defendant Amick argues that (1) the claims against him are time-barred;[5] (2) claim one (wrongful death) is barred by the CGIA; (3) claim four (fraudulent concealment of murder) is also barred by the CGIA; (4) he is entitled to qualified immunity; (5) the Fourteenth Amendment is inapplicable to the excessive force claim; (6) the official capacity claims against him fail to state a theory of municipal liability; and (7) claim five (loss of consortium/interference with protected familial relations) is barred by the CGIA.

---

[5] Because the Court finds that Plaintiffs have failed to state a claim against Defendant Amick, it declines to consider his argument that the claims against him are time-barred.

*Amick Motion to Dismiss* [#100] at 4-14. He also asks for attorney fees and costs. *Id.* at 14-15.

## II. Standards of Review

### A.    Rule 12(b)(1)

"To survive a 12(b)(1) motion to dismiss, a plaintiff must demonstrate that the court has subject-matter jurisdiction." *Audubon of Kan., Inc. v. U.S. Dep't of Interior*, 67 F.4th 1093, 1108 (10th Cir. 2023). In other words, "[a] Rule 12(b)(1) motion to dismiss only requires the court to determine whether it has authority to adjudicate the matter." *Kenney v. Helix TCS, Inc.*, 939 F.3d 1106, 1108 (10th Cir. 2019). "The party invoking federal jurisdiction has the burden to establish that it is proper, and there is a presumption against its existence." *Salzer v. SSM Health Care of Okla. Inc.*, 762 F.3d 1130, 1134 (10th Cir. 2014) (internal quotation marks omitted).

"Rule 12(b)(1) challenges may take two different forms." *Graff v. Aberdeen Enters., II, Inc.*, 65 F.4th 500, 507 (10th Cir. 2023). "The moving party may (1) facially attack the complaint's allegations as to the existence of subject matter jurisdiction, or (2) go beyond allegations contained in the complaint by presenting evidence to challenge the factual basis upon which subject matter jurisdiction rests." *Maestas v. Lujan*, 351 F.3d 1001, 1013 (10th Cir. 2003).

"When resolving a facial attack on the allegations of subject matter jurisdiction, a court must accept the allegations in the complaint as true." *Graff*, 65 F.4th at 507 (citing *Holt v. United States*, 46 F.3d 1000, 1002 (10th Cir. 1995)). However, the Court is not bound to accept conclusory allegations, unwarranted inferences, or legal conclusions. *Turner v. United States*, 501 F. App'x 840, 842 (10th Cir. 2012) (citing *Hackford v. Babbitt*,

14 F.3d 1457, 1465 (10th Cir. 1994)). Instead, the court "examine[s] the substance of [the] allegations, rather than the plaintiff's labels, to determine their true nature." *Id.* (citing *Weaver v. United States*, 98 F.3d 518, 520 (10th Cir. 1996)).

"When the moving party attacks the factual basis for subject matter jurisdiction, on the other hand, a court 'may not presume the truthfulness of the factual allegations in the complaint, but may consider evidence to resolve disputed jurisdictional facts.'" *Graff*, 65 F.4th at 507 (quoting *SK Fin. SA v. La Plata Cnty., Bd. of Cnty. Comm'rs*, 126 F.3d 1272, 1275 (10th Cir. 1997)).

## B.    Rule 12(b)(6)

Fed. R. Civ. P. 12(b)(6) permits dismissal of a claim where the plaintiff has "fail[ed] to state a claim upon which relief can be granted." The Rule 12(b)(6) standard tests "the sufficiency of the allegations within the four corners of the complaint after taking those allegations as true." *Mobley v. McCormick*, 40 F.3d 337, 340 (10th Cir. 1994). "A complaint must contain 'enough facts to state a claim to relief that is plausible on its face.'" *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "When the complaint includes 'well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief.'" *Carraway v. State Farm & Cas. Co.*, No. 22-1370, 2023 WL 5374393, at *4 (10th Cir. Aug. 22, 2023) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)).

"A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do . . . .  [n]or does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Iqbal*, 556 U.S. at 678 (internal

quotation marks omitted). "[D]ismissal under Rule 12(b)(6) is appropriate if the complaint alone is legally insufficient to state a claim." *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1104-05 (10th Cir. 2017). "The court's function on a Rule 12(b)(6) motion is not to weigh potential evidence that the parties might present at trial[.]" *Sutton v. Utah State Sch. for the Deaf & Blind*, 173 F.3d 1226, 1236 (10th Cir. 1999).

## C.   Qualified Immunity

The doctrine of qualified immunity "shields government officials performing discretionary functions from liability 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Boles v. Neet*, 486 F.3d 1177, 1180 (10th Cir. 2007) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). However, the defense of qualified immunity "is available only to individual government officials, not governmental entities." *Rome v. Romero*, 225 F.R.D. 640, 643 (D. Colo. 2004) (citing *Owen v. City of Independence*, 445 U.S. 622 (1980)).

"When a § 1983 defendant asserts qualified immunity, this affirmative defense 'creates a presumption that [the defendant is] immune from suit.'" *Est. of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161, 1168 (10th Cir. 2020) (quoting *Perea v. Baca*, 817 F.3d 1198, 1202 (10th Cir. 2016)) (modification in original). To overcome an assertion of qualified immunity, the plaintiff must show that "(1) the [defendants'] alleged conduct violated a constitutional right, and (2) it was clearly established at the time of the violation, such that 'every reasonable official would have understood,' that such conduct constituted a violation of that right." *Perea*, 817 F.3d at 1202 (quoting *Mullenix v. Luna*, 577 U.S. 7, 12 (2015)). The Court may examine the two prongs in either order. *Pearson v. Callahan*,

555 U.S. 223, 236 (2009).

When determining whether a constitutional violation occurred, the Court must look at whether the facts taken in the light most favorable to the plaintiff sufficiently allege a constitutional violation. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *Robbins v. Oklahoma*, 519 F.3d 1242, 1249 (10th Cir. 2008) (holding that, to plead a plausible claim in a case subject to qualified immunity, a plaintiff "must allege facts sufficient to show (assuming they are true) that the defendants plausibly violated [his] constitutional rights, and that those rights were clearly established at the time"). If a plaintiff fails to establish a constitutional violation, no further analysis is necessary and qualified immunity is appropriate. *See Pearson*, 555 U.S. at 236.

### III. Analysis

### A.      The Colorado Governmental Immunity Act ("CGIA")

Defendant BOCC argues that Plaintiff has failed to comply with the CGIA's notice requirements and therefore "all state law claims in the FAC should be dismissed." *Reply to BOCC Motion to Dismiss* [#111] at 3. The Court agrees, but only two claims—Claim One (wrongful death) and the loss of consortium portion of Claim Five (loss of consortium/interference with protected familial relations)—are state tort claims barred by the CGIA.

The CGIA "establishes governmental immunity from suit against public entities and their employees in tort cases, but then waives immunity under certain circumstances and also provides exceptions to certain waivers." *Springer v. City & Cnty. of Denver*, 13 P.3d 794, 798 (Colo. 2000) (citing Colo. Rev. Stat. § 24-10-106 and discussing history of governmental immunity law in Colorado). In part, the CGIA provides that "a public entity

shall be immune from liability in all claims for injury which lie in tort or could lie in tort regardless of whether that may be the type of action or the form of relief chosen by the claimant," subject to waiver for certain categories of injuries. Colo. Rev. Stat. § 24-10-106(1). "[T]he Act does not waive a public entity's sovereign immunity for claims relating to its police force." *Renalde v. City & County of Denver*, 807 F. Supp. 668, 674 (D. Colo. 1992) (citing C.R.S. §§ 24-10-104 to 24-10-108).

Even where an applicable CGIA waiver exists, to pursue a claim against a Colorado governmental entity or public employee, a claimant must file a statutorily compliant written notice within 182 days of the date of the injury's discovery. This notice is not a mere formality—it is a jurisdictional prerequisite. *See* Colo. Rev. Stat. § 24-10-109(1) ("Compliance with the provisions of this section shall be a jurisdictional prerequisite to any action brought under the provisions of this article, and failure of compliance shall for ever bar any such action."), § 24-10-118(1)(a) (applying the notice requirements to actions against public employees). Thus, failure to comply with the CGIA's notice provisions deprives the court of subject matter jurisdiction over the claim. *See, e.g.*, *Mesa Cnty. Valley Sch. Dist. No. 51 v. Kelsey*, 8 P.3d 1200, 1206 (Colo. 2000) (citing *E. Lakewood Sanitation Dist. v. Dist. Court*, 842 P.2d 233, 236 (Colo. 1992)); *Trinity Broad. of Denver, Inc. v. City of Westminster*, 848 P.2d 916, 924 (Colo. 1993). However, the CGIA does not apply to claims based on federal civil rights violations. *Martinez v. El Paso County*, 673 F. Supp. 1030, 1031 (D. Colo. 1987).

To avoid dismissal, plaintiffs must plead compliance with the CGIA's notice provisions in their complaint. *McKenzie v. City & County of Denver*, No. 21-cv-00833-PAB-STV, 2023 WL 5488465, at *8 (D. Colo. July 21, 2023) (citing *Aspen Orthopaedics*

*& Sports Med., LLC v. Aspen Valley Hosp. Dist.*, 353 F.3d 832, 840 (10th Cir. 2003)); *L.J. v. Carricato*, 413 P.3d 1280, 1288 (Colo. App. 2018) ("The plaintiff bears the burden of proving jurisdiction.") (citation omitted).

Here, Plaintiffs do not attempt to show that they complied with the CGIA's notice provisions—instead, they argue that their claims are entirely brought under federal law rather than state law. *See, e.g.*, *Response to Amick Motion to Dismiss* [#109] at 11 (arguing that "Plaintiffs['] wrongful death claim is based on the Fourth and Fourteenth Amendment"); *Response to Greeley and BOCC Motions to Dismiss* [#104] at 7-11, 13-14 (arguing that all five claims are federal constitutional claims).

### 1.    Claim One (Wrongful Death)

Plaintiffs rely on *Berry v. City of Muskogee, Oklahoma*, 900 F.2d 1489 (10th Cir. 1990) to argue that they are pursuing a "federal remedy for '§ 1983 death cases'" in the form of "a survival action, brought by the estate of the deceased victim, in accord with § 1983's express statement that the liability is 'to the party injured.'" *Response to Greeley and BOCC Motions to Dismiss* [#104] at 8 (quoting *Berry*, 900 F.2d at 1506-07). However, this argument misreads both *Berry* and Plaintiffs' own pleading.

In *Berry*, the Tenth Circuit faced the "difficult question" of "whether damages in a § 1983 action in which death occurs are limited to those recoverable under the [state] survival action alone, or to those recoverable by such a survival action and [a state] wrongful death suit, or whether damages are determined by some federal standard either as a survival or wrongful death-type action not defined or limited by state law." *Berry*, 900 F.2d at 1501. The court found that the applicable Oklahoma survival action alone would have provided "extraordinarily limited recovery" such that it was "clearly deficient in both

its remedy and its deterrent effect." *Id.* at 1504. However, the Tenth Circuit "conclude[d] that supplementing a state survival action with a state wrongful death action" would not be appropriate—rather, "federal courts must fashion a federal remedy to be applied to § 1983 death cases. The remedy should be a survival action, brought by the estate of the deceased victim[.]" *Id.* at 1506-07.

Thus, *Berry* fashioned a federal "survival action" but explicitly declined to supplant, adopt, or replace state law wrongful death actions. *Id.* at 1507 (stating that "state wrongful death actions are not foreclosed by this approach; they remain as pendent state claims."). Circuit Judge Tacha wrote separately "to make clear [her] position that a wrongful death action cannot be equated with a survival action under 42 U.S.C. sections 1983 and 1988."). *Id.* at 1510 (Tacha, J., concurring) (citing *Moor v. County of Alameda*, 411 U.S. 693 (1973)). Stated simply, nothing in *Berry* suggests that the Tenth Circuit created a new federal *wrongful death action*—instead, it created a federal *survival action*.

Since *Berry*, multiple lower courts in this Circuit have confirmed that wrongful death claims remain creatures of state law and are not cognizable as federal claims under 42 U.S.C. § 1983. *See, e.g.*, *Sanchez v. Muskogee Cnty. Sheriff*, No. CIV-21-306-JFH-GLJ, 2022 WL 19521763, at *2-*3 (E.D. Okla. Nov. 30, 2022) (applying *Berry* to reject surviving plaintiff's argument that "'she [was] not asserting any state law claim but she [was] seeking to recover under 42 U.S.C. § 1983 damages set forth in Oklahoma's wrongful death statute'" and finding that Oklahoma's governmental immunity statute barred her wrongful death claim); *Ostler v. Harris*, No. 2:18-cv-00254, 2019 WL 2409633, at *2-*3, *3 n.4 (D. Utah June 7, 2019) (applying *Berry* to dismiss the plaintiffs' "wrongful death claim under § 1983" while noting that "*Berry* does not foreclose wrongful death actions

brought as 'pendent state claims.'"); *Coleman v. Craig*, No. 88-1401-C, 1991 WL 42291, at *3 (D. Kan. Mar. 11, 1991) (observing that the *Berry* "majority tacitly admits that heirs cannot bring a federal wrongful death claim under § 1983 to recover for their loss of rights created and recognized only under state law" and refusing to recognize the plaintiff's purported "federal wrongful death claim under § 1983").

Here, even if Plaintiffs wanted to pursue the federal remedy contemplated in *Berry*, they pleaded only a *wrongful death claim*. A wrongful death claim can only be brought under state law, and because Plaintiffs have not pleaded compliance with the CGIA's notice provisions, it is barred. Therefore, the Court recommends that Plaintiffs' Claim One (Wrongful Death) be **dismissed without prejudice** under the Colorado Governmental Immunity Act. *See, e.g.*, *Aspen Orthopaedics*, 353 F.3d at 842 (reversing and remanding with instructions to dismiss three claims without prejudice due to the plaintiffs' failure to plead compliance with the CGIA).

### 2.    Claim Five (Loss of Consortium)

In Claim Five, Plaintiffs allege that they "have suffered a denial of liberty interest in consortium and marital relations with her husband Mr. Dockery in violation of her 14th [A]mendment rights, a loss of time, loss of income, and loss of consortium, affection, love, care, society, comfort, companionship, and household services of each other, as well as economic and noneconomic damages." *Id.*, ¶ 105. The Greeley Defendants argue that this is actually two claims in one: "both a state-law claim for loss of consortium and a section 1983 claim brought on behalf of the Decedent as well as Ms. Dockery for 'denial of marital relationship.'" *Greeley Motion to Dismiss* [#93] at 17. The Court agrees, and

because the loss of consortium claim is a state-law tort claim, it is barred by the failure to plead CGIA compliance.

"To the extent that Plaintiffs contend that a loss of consortium claim is a federal claim brought under 42 U.S.C. § 1983, this argument is contrary to law and is summarily rejected." *Sumpter v. Albrecht*, No. 10-cv-00580-WYD-MJW, 2011 WL 940901, at *5 n.4 (D. Colo. Mar. 6, 2011); *see also Bloom v. Toliver*, No. 12-CV-169-JED-FHM, 2015 WL 5579943, at *2 (N.D. Okla. Sept. 22, 2015) ("[L]oss of consortium claims may not be founded upon § 1983 claims asserted by a [surviving] spouse."). Because loss of consortium cannot be derivative of a 42 U.S.C. § 1983 claim, it can only arise under state law—and here, because Plaintiffs have not pleaded compliance with the CGIA, it is barred as well. *Sumpter*, 2011 WL 940901, at *5 (dismissing loss of consortium claim because the plaintiffs had not complied with CGIA notice requirements).

Accordingly, the Court **recommends** that the loss of consortium portion of Claim Five be **dismissed without prejudice** for lack of subject matter jurisdiction. *See, e.g.*, *Aspen Orthopaedics*, 353 F.3d at 842. However, the denial of familial relations portion of Claim Five is not barred by the CGIA. *See Martinez*, 673 F. Supp. at 1031 (stating that the CGIA does not apply to claims based on federal civil rights violations).

## B.    Municipal Liability and Official Capacity Claims

"[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity." *Kentucky v. Graham*, 473 U.S. 159, 166 (1985); *see also Myers v. Okla. Cnty. Bd. of Cnty. Comm'rs*, 151 F.3d 1313, 1316 n.2 (10th Cir. 1998) ("[A section 1983] suit against a municipality and a suit against a municipal official acting in his or her official capacity are the same.") (quoting *Watson v. City of Kansas City*, 857 F.2d 690,

695 (10th Cir. 1988)) (alteration in original). Thus, the Court considers Plaintiffs' municipal liability claims together with the official capacity claims against the individual defendants.

"[A] local government cannot be sued under § 1983 for an injury inflicted solely by its employees or agents." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694, 691 (1978). Instead, a municipality or local government "may be liable under this section if the governmental body itself 'subjects' a person to a deprivation of rights or 'causes' a person 'to be subjected' to such deprivation." *Connick v. Thompson*, 563 U.S. 51, 60 (2011) (citing *Monell*, 436 U.S. at 692). Plaintiffs must show "(1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." *Jiron v. City of Lakewood*, 392 F.3d 410, 419 (10th Cir. 2004) (citation omitted). This means that a plaintiff must demonstrate both a constitutional deprivation and the existence of a "municipal policy or custom." *Connick*, 563 U.S. at 60-61; *Waller v. City & Cnty. of Denver*, 932 F.3d 1277, 1283 (10th Cir. 2019) (same).

A "municipal policy or custom" may take one of the following forms: "(1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that . . . is so permanent and well settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; (4) the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval; or (5) the failure to adequately train or supervise employees, so long as that failure results from deliberate indifference to the injuries that may be caused." *Bryson v. City of Oklahoma City*, 627 F.3d 784, 788 (10th Cir. 2010) (internal quotation marks and brackets omitted).

Pleading a formal or written policy is easy: "the plaintiff can simply allege what the policy is and where it is codified." *Griego v. City of Albuquerque*, 100 F. Supp. 3d 1192, 1213 (D.N.M. 2015). Pleading an informal or unwritten policy, however, requires the plaintiff to "plead either a pattern of multiple similar instances of misconduct—no set number is required, and the more unique the misconduct is, and the more similar the incidents are to one another, the smaller the required number will be to render the alleged policy plausible—or use other evidence, such as a police officer['s] statements attesting to the policy's existence." *Id.* After all, "'[o]ne instance, however egregious, does not a pattern or practice make.'" *Waller*, 932 F.3d at 1287 (quoting *Martin v. Malhoyt*, 830 F.2d 237, 255 (D.C. Cir. 1987)).

Courts have found alleged policy to be inadequately pleaded where the plaintiff "alleged one similar prior incident" or pointed to "two alleged incidents" six years apart. *Waller*, 932 F.3d at 1287; *see also Sexton v. City of Colorado Springs*, 530 F. Supp. 3d 1044, 1071 (D. Colo. 2021); *but cf. Taylor v. Denver Health & Hosp. Auth.*, No. 23-cv-02355-CNS-KAS, 2024 WL 3874954, at *18 (D. Colo. Aug. 20, 2024) (finding that "numerous instances" involving the plaintiff and four other inmates where the defendant took a "wait and see" approach to inmate medical care was "enough to establish a pattern such that the alleged policy is plausible").

"[T]he plaintiff must tell the Court at the outset, in the complaint, (i) why he or she thinks a policy exists—alleging specific facts; and (ii) what he or she thinks the policy is. The Court will then decide whether (i) plausibly suggests (ii)." *Griego*, 100 F. Supp. 3d at 1216. At the pleading stage, "the existence of a *Monell* policy is a 'conclusion' to be built

up to, rather than a 'fact' to be baldly asserted." *Sanchez v. City of Littleton*, 491 F. Supp.

3d 904, 923 (D. Colo. 2020) (quoting *Griego*, 100 F. Supp. 3d at 1215)).

Here, Plaintiffs allege "unconstitutional policies, customs, and practices," including:

a. Cowboy culture and attitude arrests, designed to punish citizens for opposing Greeley Police and don't provide adequate training and supervision regarding these issues;

b. Using deadly force against a citizen in absence of an imminent threat;

c. Failure to deescalate and provide proper mental health assistance before using deadly force against citizens with obvious mental health issues;

d. Indiscriminate and inappropriate use of a firearm and ammunitions;

e. Failure to require officers to complete timely use-of-force reports, which negatively impact officer accountability, and failure to train regarding this issue;

f. Inadequate Body Worn Camera activation during use of deadly force and failure to train on this issue;

g. Failure to discipline officers for the excessive use of force; and failure to train on these issues; and

h. Inadequate training with respect to the identification of mental health issues suffered by citizens and allocation of mental health assistance to citizens in extreme distress.

*Fourth Am. Compl.* [#89], ¶ 34; *see also id.*, ¶ 57. All these allegations are directed at the

City of Greeley, not BOCC. *See also id.*, ¶¶ 55, 72, 86, 96 (alluding to City of Greeley's

policies in the context of *Monell* liability).

Plaintiffs are clear about *what* they think the City of Greeley's policies or practices

are, but they fail to explain *why* they think these policies exist—they do not identify even

one prior incident, and they offer no factual support for these alleged policies. *Cf. Griego*,

100 F. Supp. 3d at 1216 ("The plaintiff must tell the Court, however, what he or she has,

or else the Court will disregard the alleged policy as a naked conclusion."). The Court cannot infer the existence of allegedly unconstitutional policies or an alleged custom of inadequate training from Mr. Dockery's killing alone. *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 823-24 (1985) (finding that it had been error to instruct the jury that they could infer the existence of a policy of inadequate training from the plaintiff's single incident). Plaintiffs' policy allegations are insufficient. *Cf. Sanchez*, 491 F. Supp. 3d at 923 (dismissing *Monell* claim where "plaintiffs draw an unsupported conclusion that the defendants were acting in accordance with an official policy").

Plaintiffs' allegations against the BOCC are even more threadbare. They allege that the BOCC "govern[s]" the Weld County Sheriff's Department, which has a "widespread and well settled" "cowboy culture" that fosters "reckless and abusive conduct" and led to the "deprivation of Plaintiff's constitutional rights." *Fourth Am. Compl.* [#89], ¶¶ 4, 11. They baldly allege, "The City of Greeley and Weld County Drug Task Force, through the Greeley Police Department and Weld County Sheriff's department, and its official policy makers has a custom and widespread practice of failing to comply with their own written policies with respect to . . . (1) [s]tatutory permitted use of force; (2) retaliation against citizens; (3) reporting official misconduct," among others. *Id.*, ¶ 39. That is the extent of their allegations against BOCC. Those allegations fall well short of stating a plausible *Monell* theory of liability.

Plaintiffs—who are represented by counsel—have already amended their complaint *at least four times*, with knowledge that Greeley police officers were involved in Mr. Dockery's killing. Because Plaintiffs have had numerous opportunities to plausibly allege that a policy or custom exists, the Court **recommends** that their claims against

Defendants City of Greeley and BOCC be **dismissed with prejudice**, and that the official capacity claims against all Defendants be **dismissed with prejudice**. *See, e.g.*, *Ngatuvai v. Breckenridge*, 446 F. App'x 129, 130 (10th Cir. 2011) (affirming the district court's conclusion that "dismissal with prejudice was appropriate because [the plaintiff] had been afforded ample opportunity to cure the deficiencies in his civil rights complaint"); *Fuentes v. Chavez*, 314 F. App'x 143, 145 (10th Cir. 2009) (affirming dismissal with prejudice for failure to state a claim because "[t]here is a limit to how many bites even a pro se plaintiff can have at the apple").

**C.      Claim Two (Excessive Force)**

**1.      Fourth vs. Fourteenth Amendment**

When considering an excessive force claim under § 1983, the "analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Graham v. Connor*, 490 U.S. 386, 394 (1989) (citing *Baker v. McCollan*, 443 U.S. 137, 140 (1979)). "Where, as here, the excessive force claim arises in the context of an arrest or investigatory stop of a free citizen, it is most properly characterized as one invoking the protections of the Fourth Amendment, which guarantees citizens the right 'to be secure in their persons . . . against unreasonable . . . seizures' of the person." *Id.*

Defendant Amick argues, and the Court agrees, that Plaintiffs' claims plainly arise under the Fourth Amendment and not the Fourteenth Amendment, because Mr. Dockery was not a pretrial detainee. *See Amick Motion to Dismiss* [#100] at 11 (citing *Estate of Booker v. Gomez*, 745 F.3d 405, 419 (10th Cir. 2014)). Therefore, the Court **recommends** that Claim Two be **dismissed** to the extent it purports to state a Fourteenth Amendment claim. *See, e.g.*, *Est. of Holmes ex rel. Couser v. Somers*, 387 F. Supp. 3d

1233, 1249 (D. Kan. 2019) (dismissing Fourteenth Amendment excessive force claim because "the Fourth Amendment is the proper standard in this action") (citation omitted).

### 2. Excessive Force

Plaintiffs allege that Defendants subjected Mr. Dockery to excessive force, "namely 57-gun shots fired by the Defendants Blair, Blair [sic], Budd, Radin, [Czapinski], Wiles, and Amick from a deadly weapon without legal cause or evidence of an imminent threat of harm[.]" *Fourth Am. Compl.* [#89], ¶ 62. They acknowledge that the applicable test is set forth in *Graham v. Connor*, 490 U.S. 386, 395 (1989), and they admit that "Mr. Dockery had an active warrant for an alleged kidnapping but that he was parked in a car by a car wash." *Id.*, ¶ 65. They allege that he was given no commands to stop or get on the ground, and that Defendants gave him no opportunity to surrender. *Id.*

The Greeley Defendants argue that "the Fourth Amended Complaint only contains bulk allegations concerning the practices and policies of the City of Greeley, but there is not a single allegation describing any particular action taken by any of the individual officers." *Greeley Motion to Dismiss* [#93] at 14. The Court agrees that this is an overarching problem in the operative complaint. Where a § 1983 plaintiff lodges claims against a government agency and a number of government actors in their individual capacities, the plaintiff must "make clear exactly *who* is alleged to have done *what* to *whom*, to provide each individual with fair notice as to the basis of the claims against him or her, as distinguished from collective allegations[.]" *Robbins v. Oklahoma*, 519 F.3d 1242, 1250 (10th Cir. 2008) (emphasis in original).

However, the Court identifies exactly *three* allegations of specific officer conduct that are not "bulk allegations": Defendants Budd and Czapinski allegedly approached Mr.

Dockery after he had been shot and while he was attempting to cover his wounds; Defendant Budd allegedly shot Mr. Dockery repeatedly, killing him; and Mr. Dockery was allegedly executed by Defendants Budd and Radin. *Fourth Am. Compl.* [#89], ¶¶ 25, 81. Even these three allegations are somewhat contradictory—was Defendant Radin involved in the fatal shooting or not? In any case, Plaintiffs have sufficiently alleged that Defendant Budd (possibly along with Defendant Radin) shot and killed Mr. Dockery.[6]

Under *Graham*, to determine whether excessive force was used to effectuate arrest the Court must pay "careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396 (citing *Tennessee v. Garner*, 471 U.S. 1, 8-9 (1985)). "Deadly force is justified under the Fourth Amendment if a reasonable officer in [d]efendants' position would have had probable cause to believe that there was a threat of serious physical harm to themselves or to others." *Est. of Larsen ex rel. Sturdivan v. Murr*, 511 F.3d 1255, 1260 (10th Cir. 2008) (emphasis and internal citation omitted). However, "[t]he use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable." *Garner*, 471 U.S. at 11.

Danger to officers or the public may be the most important prong of the *Graham* analysis. *See, e.g.*, *Est. of Smart ex rel. Smart v. City of Wichita*, 951 F.3d 1161, 1175-

---

[6] Defendant Czapinski allegedly "approached" a wounded Mr. Dockery along with Defendant Budd, "with the intent and understanding to shoot and kill him," but Plaintiffs do not allege that Defendant Czapinski took any further action. *Fourth Am. Compl.* [#89], ¶ 81. The other Defendants are only collectively alleged to have shot at Mr. Dockery. *See, e.g.*, *id.*, ¶ 51 (alleging that "the responding six officers jointly and recklessly fired 57 deadly rounds into the face, skull, and body of Mr. Dockery").

76 (10th Cir. 2020) (finding no qualified immunity where circumstances suggested no security or safety threat: the officer shot and killed suspect after the suspect "fell to the ground, had his arms outstretched with his empty hands visible, and looked back at [the officer] and shook his head"); *Fancher v. Barrientos*, 723 F.3d 1191, 1196-97, 1199-1201 (10th Cir. 2013) (finding no qualified immunity for a second round of shots after the officer "was sure that he had hit [the suspect] with the initial shot to the chest because he saw him slump"); *Cordova v. Aragon*, 569 F.3d 1183, 1195 (10th Cir. 2009) (stating that using "a level of force nearly certain to cause [a suspect's] death, though without any immediate threat to himself or others," if true, "would constitute a violation of [the suspect's] Fourth Amendment right to be free from unreasonable seizure"); *Est. of Larsen*, 511 F.3d at 1258 (finding qualified immunity where the suspect "held a large knife with a blade over one foot long" and where officers told the suspect to put the knife down and he disobeyed).

Regarding the first *Graham* factor, Plaintiffs admit that Mr. Dockery "had an active warrant for an alleged kidnapping," which is a serious crime. *Fourth Am. Compl.* [#89], ¶ 65. Regarding the second *Graham* factor, Plaintiffs allege that Mr. Dockery was not an immediate threat to the Defendants' safety or the public's safety when he was killed: "[D]uring the subject incident, Mr. Dockery pulled away in a desperate attempt to survive the excessive gun fire . . . [H]is hands were at his waist covering up his wounds that were bleeding excessively . . . In the absence of any command for Mr. Dockery to get down on the ground, [Defendant] Budd shot Mr. Dockery repeatedly, killing him." *Fourth Am. Compl.* [#89], ¶ 81. Regarding the third *Graham* factor, Plaintiffs allege that Mr. Dockery was not evading or resisting arrest: "he was parked in a car by a car wash" and "[n]o commands were given to Mr. Dockery to stop or that he get on the ground." *Id.*, ¶ 65.

As pleaded, two of the three factors weigh against finding the use of deadly force was reasonable—and the severity of Mr. Dockery's alleged crime cannot, alone, justify deadly force. *See Garner*, 471 U.S. at 11 ("The use of deadly force to prevent the escape of all felony suspects, whatever the circumstances, is constitutionally unreasonable."); *Cordova*, 569 F.3d at 1195. Plaintiffs have stated a plausible claim that Defendants Budd and Radin violated Mr. Dockery's Fourth Amendment right to be free from unreasonable seizure.

The Court also finds that the law was clearly established at the time Mr. Dockery was shot and killed. *Cordova* had established, by 2009, that the use of "a level of force nearly certain to cause . . . death, though without any immediate threat to [the officer] or others" is a Fourth Amendment violation. *Cordova*, 569 F.3d at 1195. In *Estate of Smart*, decided in February 2020, the Tenth Circuit deemed constitutionally unreasonable the use of deadly force against a suspect who had fallen to the ground with visibly empty hands. *Est. of Smart*, 951 F.3d at 1176. Here, Mr. Dockery allegedly fell to the ground and his hands were covering up his wounds when Defendant Budd approached, shot, and killed him. *Fourth Am. Compl.* [#89], ¶ 81.

The Court therefore finds that Plaintiffs have made a sufficient showing to defeat Defendant Budd's and Defendant Radin's assertions of qualified immunity at this stage.[7] Accordingly, the Court **recommends** that the Greeley Motion to Dismiss [#96] be **denied**

---

[7] Defendants strongly dispute Plaintiffs' characterization of the situation. For example, Defendant Amick asserts that Mr. Dockery "carjacked an elderly couple at gunpoint and continued his escape," after which he "committed a second carjacking at gunpoint." *Amick Motion to Dismiss* [#100] at 2. If true, the use of force may have been reasonable as a matter of law. At this stage, however, the Court may not consider factual disputes. *See, e.g.*, *Neitzke v. Williams*, 490 U.S. 319, 327 (1989) ("What Rule 12(b)(6) does not countenance are dismissals based on a judge's disbelief of a complaint's factual allegations.").

**in part**, and that Claim Two (Excessive Force) be permitted to proceed against Defendants Budd and Radin in their individual capacities.

However, Plaintiffs have made no equivalent showing as to Defendants Blair, Czapinski, Wiles, Amick, or Unknown Officers 1-2. Aside from Defendant Czapinski allegedly "approach[ing] Mr. Dockery" with Defendant Budd, the Fourth Amended Complaint [#89] alleges no specific conduct by any of these other individual officers. *Fourth Am. Compl.* [#89], ¶ 81.

Although Plaintiffs have repeatedly amended their complaint, they only recently learned the officers' identities, so the Court does not find a repeated failure to cure deficiencies which might justify dismissal with prejudice. *See, e.g.*, *Third Am. Compl.* [#53] (identifying all officers as "Unknown Officers"). Therefore, the Court **recommends** that Claim Two (Excessive Force) be **dismissed without prejudice** as to Defendants Blair, Czapinski, Wiles, Amick, and Unknown Officers 1-2, on the basis of qualified immunity and failure to state a claim. *See, e.g.*, *Sheldon v. Vermonty*, 269 F.3d 1202, 1207 n.5 (10th Cir. 2001) ("As a general matter, a party should be granted an opportunity to amend his claims prior to a dismissal with prejudice.").

**D.    Claim Three (Conspiracy)**

The Tenth Circuit has recognized a § 1983 conspiracy claim, i.e., "a conspiracy to deprive a plaintiff of a constitutional or federally protected right under color of state law." *Dixon v. City of Lawton, Okla.*, 898 F.2d 1443, 1449 n.6 (10th Cir. 1990) (collecting cases). "Provided that there is an underlying constitutional deprivation, the conspiracy claim allows for imputed liability; a plaintiff may be able to impose liability on one defendant for the actions of another performed in the course of the conspiracy." *Id.* (citing

*Landrigan v. City of Warwick*, 628 F.2d 736, 742 (1st Cir. 1980); *Ryland v. Shapiro*, 708 F.2d 967, 974 (5th Cir. 1983)).

To state a § 1983 conspiracy claim, the plaintiff must "allege 'specific facts showing an agreement and concerted action among defendants'—an 'agreement upon a common, unconstitutional goal,' and 'concerted action' taken 'to advance that goal.'" *Bledsoe v. Carreno*, 53 F.4th 589, 609 (10th Cir. 2022) (cleaned up) (quoting *Tonkovich v. Kan. Bd. of Regents*, 159 F.3d 504, 533 (10th Cir. 1988); *Janny v. Gamez*, 8 F.4th 883, 919 (10th Cir. 2021)). Because direct evidence of a conspiracy is rare, a defendant's assent can be inferred from their acts in furtherance of the conspiracy's purpose. *Id.* (citing *United States v. Edmonson*, 962 F.2d 1535, 1548 (10th Cir. 1992)). However, "allegations of conspiracy must provide some factual basis to support the existence of the elements of conspiracy: agreement and concerted action." *Crabtree ex rel. Crabtree v. Muchmore*, 904 F.2d 1475, 1481 (10th Cir. 1990).

In *Bledsoe v. Carreno*, for example, the plaintiff had plausibly alleged a § 1983 conspiracy by alleging "the specific goal of the conspiracy—to frame [him] despite overwhelming evidence of [his brother] Tom's guilt," along with a bevy of supporting factual allegations. 53 F.4th at 609-10. Those allegations included a meeting between two defendants to plan fabrication of Tom's story, three defendants did not subject Tom's room and clothing to rigorous forensic examination, and those defendants failed to collect any physical evidence from the truck where the victim was supposedly shot or from the shovel supposedly used to bury the body. *Id.* The plaintiff identified "specific actions [d]efendants allegedly took to carry out the plan, including fabricating and supporting Tom's false story; fabricating other inculpatory evidence, such as the false polygraph test

results and the false statement that [the plaintiff] had admitted to returning home at the time when [the victim] disappeared; purposefully neglecting to search for evidence that would implicate Tom in the murder; and suppressing evidence that would tend to exculpate [the plaintiff]." *Id.* at 610. The plaintiff further alleged that Tom's suicide note had "claimed that the Jefferson County police and prosecutor . . . made Tom send [the] innocent [plaintiff] to prison and refused to listen to Tom." *Id.* The Tenth Circuit held that these allegations, taken together, sufficiently alleged the existence of a conspiracy to violate the plaintiff's constitutional rights. *Id.*

Here, Plaintiffs' conspiracy allegations fall far short. Their relevant well-pleaded factual allegations are as follows:

- "Defendants confess[ed] to Mr. Dockery's wife and family that the decision was already made to kill Mr. Dockery, and that they were acting on a shoot to kill order regardless of the circumstances, which would leave no opportunity for surrender";

- Defendants "shot 57 rounds of ammunition at Mr. Dockery"; and

- "[D]uring the subject incident, Mr. Dockery pulled away in a desperate attempt to survive the excessive gun fire . . . Despite Mr. Dockery's serious injuries and the obvious absence of any threat of imminent harm to the Officers and the public, in that, his hands were at his waist covering up his wounds that were bleeding excessively, [Defendants] Budd and [Czapinski] approached Mr. Dockery . . . In the absence of any command for Mr. Dockery to get down on the ground, [Defendant] Budd shot Mr. Dockery repeatedly, killing him[.]"

*Fourth Am. Compl.* [#89], ¶¶ 79, 80, 81. Most of the well-pleaded facts go to the use of excessive force, but they say nothing about conspiracy.

The alleged "Defendants['] confession to Mr. Dockery's wife and family that the decision was already made to kill Mr. Dockery" is ominous but far too vague to support the existence of a conspiracy. *Id.*, ¶ 79. After reading the Fourth Amended Complaint [#89], the Court has no idea who allegedly decided to kill Mr. Dockery; who issued the alleged "kill order"; when the alleged agreement was made; when and how the Defendants learned of the "kill order"; what was each Defendant's role in the alleged conspiracy; and what (if any) specific actions each Defendant took in furtherance of the conspiracy. Plaintiffs did not allege even basic facts showing agreement or concerted action—even facts Plaintiff ought to know, such as which Defendant confessed to Mrs. Dockery that there was a kill order and when the confession was made. *See, e.g.*, *Khalik v. United Air Lines*, 671 F.3d 1188, 1194 (10th Cir. 2012) (dismissing complaint under Rule 12(b)(6) and stating that, while the court "do[es] not mandate the pleading of any specific facts in particular, there are certain details the Plaintiff should know and could properly plead to satisfy the plausibility requirement"). Plaintiffs raise the mere *possibility* of conspiracy, which is not enough to survive dismissal. *Cf. Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007) (stating that "a naked assertion of conspiracy . . . gets the complaint close to stating a claim, but without some further factual enhancement it stops short of the line between possibility and plausibility"); *Abercrombie v. City of Catoosa, Okla.*, 896 F.2d 1228, 1230-31 (10th Cir. 1990) (finding that "two isolated statements" made by alleged co-conspirators, without evidence of communication *between* them, did not "give rise to the inference that they conspired").

Plaintiffs have failed to state a § 1983 conspiracy claim. As with Claim Two (Excessive Force), the Court finds that Plaintiffs' recent discovery of the officers' identities weighs against prejudicial dismissal of this claim. Accordingly, the Court recommends that Claim Three (Conspiracy) be **dismissed without prejudice**. *Sheldon*, 269 F.3d at 1207 n.5.

**E.    Claim Four (Fraudulent Concealment of Murder)**

In Claim Four, Plaintiffs allege that Defendants concealed the identity of officers and staff who were involved in Mr. Dockery's death. *See, e.g.*, *Fourth Am. Compl.* [#89], ¶ 92. They allege that this was intended "to prevent redress of grievances and/or prevent access to the Federal Courts" and with the purpose that "Mr. Dockery would be deprived of his ability to redress grievances and bring his constitutional claim." *Id.*, ¶¶ 93, 95. They allege that cover-ups are part of the Defendant City's policy or customs *Id.*, ¶ 98.

Defendant Amick notes, and the Court agrees, that "it is difficult to determine which claim Plaintiffs intend to assert in [this] cause of action." *Amick Motion to Dismiss* [#100] at 7. However, because Plaintiffs invoke the First and Fourteenth Amendments, the Court construes Claim Four as alleging a violation of the "right of access to the courts [as] an aspect of the First Amendment right to petition the Government for redress of grievances." *Bill Johnson's Restaurants, Inc. v. N.L.R.B.*, 461 U.S. 731, 741 (1983). In support of this reading, the Court notes that Plaintiffs' briefing invoked "the right to be free from interference with Court Access by governmental officials" and alleged "misconduct that deprives its victims of the means of challenging unlawful conduct in court." *Response to Amick Motion to Dismiss* [#109] at 18 (citations omitted).

Claims of denial of access to courts have been divided into two categories: "Forward looking claims involve official action that 'frustrates a plaintiff's ability to bring a suit at the present time,' and backwards looking claims 'arise when plaintiffs allege that a specific claim cannot be tried [. . . ] because past official action causes the loss or inadequate settlement of a meritorious claim." *A.M. v. N.M. Dep't of Health*, 148 F. Supp. 3d 1232, 1282 (D.N.M. 2015) (quoting *Jennings v. City of Stillwater*, 383 F.3d 1199, 1208 (10th Cir. 2004)) (modification in original). However, "[a]ll elements in a court access claim must be 'addressed by allegations in the complaint sufficient to give fair notice to a defendant.'" *Id.* (quoting *Christopher v. Harbury*, 536 U.S. 403, 416 (2002)).

Here, the Court finds that Claim Four, to the extent it is construed as a First Amendment access of courts claim, fails to state a constitutional violation. Plaintiffs do not plausibly allege that Defendants have engaged in any conduct that frustrates their ability to bring suit at the present time, or that Defendants have engaged in past official action that caused them to lose or inadequately settle a meritorious claim. *Jennings*, 383 F.3d at 1208. After all, Plaintiffs are currently before this court pursuing claims against the City, Board of County Commissioners, and police officers arising from Mr. Dockery's killing. They have not alleged any actual obstruction of their access to court. To the extent that the Court recommends dismissal of many of Plaintiffs' claims, that is not due to Defendants' interference but due to Plaintiffs' own failure of pleading. Moreover, the Court recognizes that Plaintiffs were only recently able to identify the Defendant officers and has recommended that dismissal of claims related to the officers be without prejudice.

Plaintiffs have failed to state a violation of their First Amendment right to access the courts. Accordingly, the Court recommends that Claim Four (Fraudulent Concealment of Murder) be **dismissed without prejudice**. *Sheldon*, 269 F.3d at 1207 n.5.

**F.     Claim Five (Interference with Protected Familial Relations)**

As previously noted, Plaintiffs' Claim Five is a two-headed claim for "loss of consortium and denial of marital relationship." *See Fourth Am. Compl.* [#89] at 34. The state law loss of consortium portion of this claim is barred by the CGIA, so the Court considers the federal claim of interference with protected familial relations.

Familial relationships are constitutionally protected "from unwarranted intrusion by the state." *Trujillo v. Bd. of Cnty. Comm'rs of Santa Fe Cnty.*, 768 F.2d 1186, 1189-90 (10th Cir. 1985). However, to state such a § 1983 claim, "an allegation of intent to interfere with a particular relationship protected by the freedom of intimate association is required[.]" *Id.* at 1190. "The alleged conduct by the State, however improper or unconstitutional with respect to the [decedent], will work an unconstitutional deprivation of the freedom of intimate association *only if the conduct was directed at that right.*" *Id.* (emphasis added).

Here, Plaintiff's Fourth Amended Complaint [#89] does not allege that Defendants were even aware of Mr. Dockery's marital relationship, much less that they acted with intent to deprive Mrs. Dockery of that protected relationship. *See Fourth Am. Compl.* [#89], ¶¶ 100-105. With no allegations of Defendants' intent to interfere in the Dockery marriage, Plaintiffs have failed to state a claim. *Trujillo*, 768 F.2d at 1190 ("Because the [plaintiffs] did not allege such intent, their complaint was properly dismissed for failure to state a constitutional claim."); *see also Est. of Herring ex rel. Fort v. City of Colorado*

*Springs*, 233 F. App'x 854, 856 (10th Cir. 2007) (stating that Tenth Circuit precedent since *Trujillo* has "clearly preserve[d] direction and intent as a requirement for stating a cause of action for the violation of the constitutional right to familial association").

*Trujillo* is on-point, binding Tenth Circuit precedent. Plaintiffs have failed to state a constitutional claim for violation of Mrs. Dockery's freedom of intimate association because they do not allege intent to deprive Mrs. Dockery of her protected marital relationship. *See Trujillo*, 768 F.2d at 1189. Accordingly, the Court respectfully **recommends** that Claim Five be **dismissed without prejudice** to the extent it alleges a deprivation of the freedom of intimate association.

## IV. Conclusion

Based on the foregoing,

IT IS HEREBY **RECOMMENDED** that Defendant BOCC's Motion to Dismiss [#96] and Defendant Amick's Motion to Dismiss [#100] be **GRANTED**.

IT IS FURTHER **RECOMMENDED** that the Greeley Defendants' Motion to Dismiss [#93] be **GRANTED IN PART** and **DENIED IN PART**.

IT IS FURTHER **RECOMMENDED** that Plaintiffs' claims against Defendant City of Greeley, Defendant BOCC, and their official capacity claims against Defendants Blair, Budd, Radin, Czapinski, Wiles, Amick, and Unknown Supervisors 1-2 be **DISMISSED WITH PREJUDICE**.

IT IS FURTHER **RECOMMENDED** that Claims One (Wrongful Death), Three (Conspiracy), Four (Fraudulent Concealment of Murder), and Five (both Loss of Consortium and Denial of Marital Relationship) be **DISMISSED WITHOUT PREJUDICE**.

IT IS FURTHER **RECOMMENDED** that Claim Two (Excessive Force) be **DISMISSED** to the extent it purports to allege a Fourteenth Amendment claim.

IT IS FURTHER **RECOMMENDED** that Claim Two (Excessive Force) be **DISMISSED WITHOUT PREJUDICE** as to Defendants City of Greeley, Board of County Commissioners, Czapinski, Wiles, Amick, and Unknown Supervisors 1-2.[8]

IT IS FURTHER **ORDERED** that any party may file objections **within 14 days** of service of this Recommendation. In relevant part, Fed. R. Civ. P. 72(b)(2) provides that, "within 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for de novo review by the district court or for appellate review." *United States v. 2121 E. 30th St.*, 73 F.3d 1057, 1060 (10th Cir. 1996). The objection must be "sufficiently specific to focus the district court's attention on the factual and legal issues that are truly in dispute." *Id.* "[A] party who fails to make a timely objection to the magistrate judge's findings and recommendations waives appellate review of both factual and legal questions." *Morales-Fernandez v. I.N.S.*, 418 F.3d 1116, 1119 (10th Cir. 2005).

Dated: August 26, 2024                     BY THE COURT:

Kathryn A. Starnella

---

[8] If this Recommendation is adopted in full, the only remaining claim will be a Fourth Amendment excessive force claim against Defendants Budd and Radin in their individual capacities.

United States Magistrate Judge